IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| JOSE DOMINGUEZ AND SANDRA DOMINGUEZ BOTH INDIVIDUALLY AND AS NEXT FRIENDS OF EMILY DOMINGUEZ, THEIR MINOR DAUGHTER, § § § § § § PLAINTIFFS, § § V. § UNITED STATES OF AMERICA, § § DEFENDANT. § | CAUSE NO. A-03-CA-134-LY |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BE IT REMEMBERED that on June 21, 2004, the Court called the above-styled case for trial. Plaintiff Sandra Dominguez appeared in person and on behalf of Plaintiff Emily Dominguez, a minor; Plaintiff Jose Dominguez, a member of the United States Army, serving in Iraq at time of trial, did not appear. Plaintiffs were represented by counsel. Defendant United States of America appeared by designated representative, Colonel Ann Hochhausen, and was represented by the United States Attorney. The case was tried to the bench. Having carefully considered the evidence presented and the applicable law, the Court concludes that the United States is liable to Emily Dominguez, Sandra Dominguez, and Jose Dominguez for damages in the amounts described below. In so deciding, the Court makes the following findings of fact and conclusions of law, holding, in summary, that the United States, through its employees at Darnall Army Community Hospital ("Darnall"), breached its duty of care in the delivery of Emily Dominguez on December 20, 2000, and caused her severe brain damage.

## I. Procedural History, Venue, and Jurisdiction

The Court's jurisdiction over this healthcare negligence action arises under the Federal Tort Claims Act. *See* 28 U.S.C. §§ 1346(b), 2671-2680 (the "Act"). Plaintiffs have satisfied the administrative prerequisites to suit and seek recovery for injuries incurred as a result of the alleged negligence of the United States, through its employees at Darnall. *See* 28 U.S.C. §§ 2401(b), 2675. Under the Act, a plaintiff may recover damages where the United States, if a private person, would be liable in accordance with the law of the state where the act or omission occurred–here, Texas. *See* 28 U.S.C. § 1346(b); *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003); *Lebron v. United States*, 279 F.3d 321, 326 n.4 (5th Cir. 2002).

At all times relevant to this action, the United States, through the Department of Defense and the United States Army, owned and operated Darnall. Further, at all times relevant to this action, nurses Sharon Moton and Ann Hochhausen were employees of the United States acting within the course and scope of their employment.

## II. Facts

Sandra Dominguez, the pregnant wife of Jose Dominguez, a member of the United States Army, obtained her prenatal care at Darnall and attended each of her prenatal appointments with her husband. Until December 20, 2000, Sandra Dominguez's pregnancy was uncomplicated.

On December 20, Sandra Dominguez, who was forty-one weeks pregnant at the time,[1] arrived at Darnall's obstetrics and gynecology clinic (the "Clinic") for a scheduled, routine non-stress test ("NST") to evaluate her fetus's well-being. The NST was performed at the clinic, on the first floor of Darnall. During an NST, monitors are placed on the mother's abdomen to detect her

---

[1] Forty weeks is the normal gestational period for human beings; on December 20, Sandra Dominguez was one week past her due date.

2

contractions and the fetus's heart rate. The readings are recorded on a paper called a fetal-monitor strip. The Dominguezes arrived at the Clinic at 1:09 p.m., and Sandra Dominguez was placed on the fetal heart-rate monitor at 1:23 p.m. The fetus's heart rate was approximately 130 to 140 beats per minute, which is within the normal range; however, the heart rate demonstrated only slight accelerations and decelerations, described as "minimal variability." Minimal variability occurs in various situations, including when a fetus is sleeping, when the mother is under the influence of certain drugs, or–in the worst-case scenario–when a fetus is experiencing metabolic acidosis and is "compensating." During compensation, an acidotic fetus shunts oxygen to its most vital organs, the heart and brain. When a fetus can no longer continue shunting oxygenated blood to the heart and brain, "decompensation" occurs. Because of the possibility that the fetus is compensating for acidosis, a minimally variable pattern–such as Emily Dominguez's–is called "nonreassuring."[2]

Plaintiff's expert witness, Dr. Michael Cardwell, a perinatologist[3] described the medical standard of care for fetuses exhibiting nonreassuring fetal heart-rate patterns as follows: when confronted with a nonreassuring fetal heart-rate pattern, a healthcare provider should identify the cause, correct the cause, and perform intrauterine resuscitative measures ("IURMs") to increase oxygen to the fetus. Although there is no way to determine how long a fetus can persist in a state of compensated fetal acidosis before decompensating, increasing oxygen to the mother through the use of IURMs can prolong the time period. Such IURMs include administering oxygen to the mother through a face mask, repositioning the mother, and hydrating her.[4] If the pattern remains

---

[2] To be "reassuring," a monitor strip must show two accelerations (defined as an increase of fifteen beats per minute for fifteen seconds) in a ten-minute period.

[3] A perinatologist is doctor of obstetrics and gynecology with a subspecialization in maternal-fetal health.

[4] A fourth IURM, decreasing pitocin or oxytocin, is inapplicable in this case because Sandra Dominguez was not taking these drugs at the time of her NST.

3

nonreassuring, the healthcare provider should attempt to rule out the possibility that the fetus is acidotic, which can be done by measuring the pH of the fetus's scalp to determine the acidity/alkalinity of the fetus's blood, utilizing fetal pulse oximetry, and monitoring for spontaneous or elicited fetal heart-rate accelerations.[5] Pursuant to guidelines established by the American College of Obstetricians and Gynecologists ("ACOG"), if fetal acidosis cannot be ruled out as the cause of a nonreassuring strip, then the fetus should be delivered expeditiously, which, according to Dr. Cardwell, means within thirty minutes. The Court finds Dr. Cardwell a credible witness.

The healthcare providers in the Clinic, namely Moton, who administered the NST, and Hochhausen, the Clinic's head nurse, did not adhere to this standard of care. Sandra Dominguez was placed on the monitor at 1:23 p.m. The fetus did not exhibit any accelerations during the first ten minutes of the NST. At 1:33 p.m., vibroacoustic stimulation ("VAS")[6] was used to determine if the minimal variability of the fetus's heart rate could be attributed to a sleep cycle. The VAS failed to elicit any accelerations. At 1:34 p.m., Sandra Dominguez was repositioned from her left side to her right side. At 1:39 p.m., VAS was again used, and again the fetus did not respond. At that point, it should have been clear to the nurses in the Clinic that the baby was not sleeping. Further, when a fetus with a nonreassuring heart-rate pattern fails to respond to VAS, there is a fifty-percent chance that the fetus is experiencing compensated fetal acidosis. Hochhausen testified that although she recognized the one-in-two chance that Emily Dominguez was experiencing compensated fetal acidosis, she did not feel the administration of oxygen was warranted. According to Dr. Cardwell, a fetus's failure to react to VAS is not, standing alone, a sign of brain damage. In his opinion, the

---

[5] This procedure is outlined in table 9.4 of the second edition of *Fetal Heart Rate Monitoring* by Dr. Roger K. Freeman, Dr. Thomas J. Garite, and Dr. Michael P. Nageotte.

[6] A vibroacoustic stimulator is an electronic device that makes a loud buzzing noise. When placed against a mother's abdomen and activated, the stimulator should wake a sleeping fetus, causing its heart rate to accelerate.

4

fetal-monitor strip's reflection that the fetal heart-rate pattern was variable, albeit minimal, reflected that Emily Dominguez's brain stem was receiving oxygen. However, when a fetal heart-rate pattern is persistently nonreassuring *and* acidosis is present or cannot be ruled out, the fetus should be delivered by the most expeditious route possible. *See American College of Obstetricians and Gynecologists Technical Bulletin No. 207* (July 1996). In the opinion of Dr. Cardwell, the decision to deliver the fetus by the most expeditious route–in this case, caesarean section–should have been made by 1:43 p.m., when it was clear from the VAS that the fetus was not sleeping, and the possibility that it was experiencing compensated fetal acidosis was fifty percent. IURMs should have been used to increase oxygen to the fetus in the meantime. However, with the exception of repositioning Sandra Dominguez twice–at 1:34 p.m. and at 1:44 p.m.–no IURMs were attempted. After Sandra Dominguez was repositioned at 1:44 p.m., no further measures were taken until she was removed from the monitor twenty-nine minutes later at 2:13 p.m. Significantly, from the time the NST began at 1:23 p.m. until the time it was completed at 2:13 p.m., the fetal heart-rate pattern remained nonreassuring.

After Sandra Dominguez was removed from the monitor, Hochhausen reviewed the fetal-monitor strip and performed an ultrasound, which revealed decreased amniotic fluid (oligohydramnios). Hochhausen determined that labor should be induced[7] and sent the Dominguezes upstairs one floor to the labor-and-delivery unit. No one communicated to them that Emily Dominguez could be in danger, that an emergency existed, or that there was urgency in reaching labor and delivery, located on Darnall's second floor. They walked unescorted, each stopping to use the restroom. Upon reaching labor and delivery, they waited in line to check in, and at 2:39 p.m.,

---

[7] Because Sandra Dominguez's cervix was closed, the induced vaginal delivery recommended by Hochhausen most likely would have taken approximately twelve hours and could not be considered delivery by the "most expeditious route."

5

twenty-six minutes after being removed from the monitor in the Clinic, Sandra Dominguez was placed on a monitor in labor and delivery. For a short time, Emily Dominguez's fetal heart rate continued as before–in the normal range with minimal variability.

At 2:42 p.m., Dr. John Ervin, a resident, performed a vaginal exam and determined that Sandra Dominguez's cervix was closed. At that time, the fetus's heart rate began to drop. At 2:46 p.m., fetal bradycardia–a significantly reduced heart rate–began. At 2:28 p.m., Sandra Dominguez was given oxygen by face mask and fluids intravenously. At 2:49 p.m., Dr. Reginald Singleton, the attending physician, was called. He arrived at 2:50 p.m. and determined that the fetus was alive by using ultrasound. The fetus's heart rate continued to decline, and at 2:52 p.m., Dr. Singleton decided an emergency caesarean section was necessary to save Emily Dominguez's life. Dr. Ervin testified that as Sandra Dominguez was being transported to the operating room, he had a conversation with her in Spanish, during which he obtained her consent to have the caesarean section and asked her when she last felt the baby move. He testified that she responded, "Hace dos dias," or, "It makes two days." However, Dr. Ervin's postoperative notes record his conversation as reflecting decreased (indicated by a down arrow) fetal movement for two days.[8]

Dr. Singleton delivered Emily Dominguez by emergency caesarean section at 3:02 p.m. Emily was asystolic–she had no heart rate–and was not breathing when she was born. This condition persisted for eight minutes as Dr. Singleton attempted to resuscitate her, which he succeeded in doing at 3:10 p.m. Her Apgar scores were 0 at one minute, 0 at five minutes, and 3 at ten minutes of life.[9] Emily Dominguez suffered brain damage and multisystem organ failure, and has been

---

[8] Although Sandra Dominguez testified that she did not recall her conversation with Dr. Ervin, she acknowledged that she perceived decreased fetal movement on December 19. She drank a coca cola, as she had been instructed to do in such situations, and she felt the baby kick.

[9] Apgar scoring is used to characterize a newborn baby's condition immediately after birth. Babies are given scores of zero, one, or two in five categories (appearance, pulse, grimace, activity,

diagnosed with spastic quadriplegic cerebral palsy. Dr. Cardwell testified within a reasonable degree of medical probability that had Moton and Hochhausen reacted to the nonreassuring fetal heart-rate pattern by instituting IURMs, Emily Dominguez would have been able to compensate for a longer time period. He further testified that had the decision to perform an expeditious caesarean section been made at 1:43 p.m., Emily would not have suffered brain damage. He opined that failure to institute IURMs and move toward an expeditious caesarean section, once the possibility of fetal acidosis could not be ruled out (*i.e.*, by 1:43 p.m.), breached the previously described standard of care to be followed by health practitioners in such situations.

ACOG lists four criteria which must be met before an acute *intra partum* hypoxic event–such as the event suffered by Emily Dominguez–may be considered sufficient to cause cerebral palsy:

> 1. Evidence of a metabolic acidosis in fetal umbilical cord arterial blood obtained at delivery (pH < 7 and base deficit ≥ 12 mmol/L); 2. Early onset of severe or moderate neonatal encephalopathy in infants born at 34 or more weeks of gestation; 3. Cerebral palsy of the spastic quadriplegic or dyskinetic type; and 4. Exclusion of other etiologies, such as trauma, coagulation disorders, infectious conditions, or genetic disorders.[10]

Emily Dominguez meets these criteria. All testifying experts agreed that the asphyxial episode that Emily Dominguez suffered at birth, consisting of sixteen minutes of bradycardia just before birth and eight minutes of asystole after birth, was sufficient to cause her condition.

Although agreeing that the hypoxic-ischemic event that Emily suffered at birth *could* have caused her condition, the Government proposed an alternate theory–that Emily suffered an earlier asphyxial event which left her brain damaged *before* Jose and Sandra Dominguez arrived at Darnall at 1:09 p.m. on December 20, 2000. The Government offered the testimony of Dr. Edwina Popek,

---

and respiration). The minimum score is zero; the maximum score is ten.

[10] The American College of Obstetricians and Gynecologists, *Neonatal Encephalopathy and Cerebral Palsy* 74 (Jan. 2003).

a placental pathologist, to show that Sandra Dominguez's placenta was abnormally shaped[11] and stained with meconium,[12] and she was suffering from an infection called chorioamnionitis[13] when Emily was born. Dr. Popek further testified that the levels of lymphocytes, nucleated red blood cells, and the liver enzymes AST and ALT[14] present in Emily Dominguez's blood shortly after she was delivered indicated that she suffered an injury approximately twelve hours before her birth. In addition, the Government presented the testimony of Dr. Michael Belfort, a perinatologist, who surmised that the fetus experienced an asphyxial event two to two-and-a-half days before delivery, coincident with Sandra Dominguez's perception of decreased fetal movement. Dr. Belfort testified that this near-death event most likely resulted from compression of the umbilical cord and resulted in multisystem organ failure and brain damage such that delivering the baby earlier on December 20 would not have affected her current condition. Dr. Belfort based his hypothesis on Sandra Dominguez's perception of decreased fetal movement as well as on the minimal variability of the fetus's heart rate.

The witnesses disagreed regarding the inference to be drawn from the fetus's minimally varying heart rate shown on the monitor strip from the Clinic. Dr. Singleton testified that nothing on the fetal-monitor strip from the Clinic indicated that the fetus was brain damaged at that point.

---

[11] The placenta is the organ through which nutrients are supplied to the developing fetus, via the umbilical cord. Sandra Dominguez's placenta was bilobed, rather than the normal round shape, which can lead to marginal cord insertion (*i.e.*, the cord inserts between the lobes), limiting the fetus's access to nutrients from the placenta. Plaintiffs point out that Emily Dominguez had obviously been receiving nutrients throughout her gestation as she was a large, fully developed baby, weighing over nine pounds at birth.

[12] Meconium is waste which generally constitutes a newborn baby's first bowel movement. However, meconium may be passed by a fetus *in utero*.

[13] Chorioamnionitis is an infection of the placental tissues and amniotic fluid.

[14] AST stands for aspartate aminotransferase. ALT stands for alanine aminotransferase.

Further, Dr. Cardwell testified that the minimal variability of the fetal heart rate in fact indicated that the fetus was *not* yet brain damaged. Defendant's expert perinatologist, Dr. Robert Carpenter, disagreed, testifying that the minimal variations indicated the fetus was already "neurologically impaired," and Dr. Belfort testified that the fetus's heart-rate pattern showed that the fetus's brain was not "telling the heart" how to regulate its speed–indicating that a hypoxic event had already occurred, though he acknowledged that the fetus's heart rate was within the normal range and that the minimal variations were "better" than no variations at all. Drs. Carpenter and Belfort both testified that the bradycardia and asystole Emily suffered at birth were sufficient to cause her current injury. Dr. Carpenter testified that "a substantial portion" of Emily's brain damage did in fact occur during the bradycardiac and asystolic events at her birth and that he could not quantify the percent of the injury that he believed resulted from the supposed earlier asphyxial event versus the hypoxic-ischemic event at birth.

The evidence is undisputed that Emily Dominguez suffered multisystem organ failure as a result of some asphyxial event prior to or at her birth. Though her other organs have recovered, Emily's brain suffered severe and irreversible damage which has left the now four-year-old child with the physical and mental capabilities of a child aged two to five months. Emily has been diagnosed with spastic quadriplegic cerebral palsy. Her condition is permanent. She is completely dependent on others for all aspects of her daily life. She is blind;[15] she cannot sit without support, walk, or talk, and she is incontinent of bladder and bowel. She cannot control her muscles, which move erratically leading to medical complications. For example, Emily's legs spontaneously cross–a condition called "scissoring"–causing hip dislocations for which Emily has already had one surgery.

---

[15] Emily has cortical blindness. Although nothing is wrong with her eyes, the part of her brain that should interpret the images from her eyes does not function.

She is fed through a gastronomy tube because she is unable to eat enough on her own and has difficulty swallowing without choking; she vomits daily. Despite her extreme physical and mental limitations, Emily still feels pleasure and pain and experiences human emotions, such as happiness and sadness.

Currently, Emily's parents care for her twenty-four hours a day and have been able to maintain her health despite the difficulties Emily's condition presents. However, because of her immobility, Emily has an increased risk of developing decubitus ulcers (bed sores). Because of her vomiting, Emily also has an increased risk of developing aspiration pneumonia. According to Dr. Alex Willingham, a physiatrist, these risks and others reduce Emily's life expectancy by twenty to thirty percent from the life expectancy of the average Caucasian (including Hispanic) female living in the United States. At the time Dr. Willingham prepared his report, Emily was 2.8 years old. The average residual life expectancy for a 2.8-year-old Caucasian female living in the United States was 78.4 years (for a total life expectancy of 81.2 years).[16] Dr. Willingham calculated Emily's residual life expectancy to be fifty-nine years–indicating that her total life expectancy is approximately sixty-two years.

### III. Applicable Law

Texas law applies in this case. *See* 28 U.S.C. § 1346(b); *Quijano*, 325 F.3d at 567. Under Texas law, a plaintiff alleging medical negligence must prove "(1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury, and (4) a causal connection between the breach of care and the injury." *Quijano*, 325 F.3d at 567 (citing *Mills v. Angel*, 995 S.W.2d 262, 267 (Tex. App.–Texarkana 1999, no pet.); *Denton Reg'l*

---

[16] This information is taken from the December 19, 2002 National Vital Statistics Reports, United States Life Tables, 2000, Vol. 51, No. 3, Table 6, Life Table for White (Hispanic) Females.

*Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App.–Fort Worth 1997, no pet.)). The plaintiff bears the burden of proving the defendant's negligence by a preponderance of the evidence. *See Burlington-Rock Island R.R. Co. v. Ellison*, 167 S.W.2d 723, 726 (Tex. 1943); *see also Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 462-63 (Tex. 1992) (Cornyn, J., dissenting) ("It is axiomatic that the plaintiff in a negligence case bears the burden of establishing each element of his or her cause of action by a preponderance of the evidence.") (citing W. Prosser & W. Keeton, *The Law of Torts* § 38 (3d ed. 1984)).

To determine state-law questions, federal courts look to final decisions of the highest court of the state. Where there is no ruling by the state's highest court, it is the duty of the federal court to determine, as best it can, what the highest court of the state would decide. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340, 342 (5th Cir. 1999); *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992).

## IV. Findings and Conclusions

### A. Elements of Medical Negligence

The Court finds that Plaintiffs have proved the following by a preponderance of the evidence: Sandra Dominguez's fetus was acidotic but compensating when Sandra and Jose Dominguez arrived at the Clinic on December 20, 2000. When confronted with the fetus's nonreassuring heart-rate pattern, the Clinic's staff breached the applicable standard of care by failing to perform appropriate IURMs such as administering oxygen by face mask and providing fluids intravenously. Further, once it became apparent that the fetus was not sleeping and the possibility that the fetus was acidotic could not be ruled out (at approximately 1:43 p.m.), the Clinic's staff again breached the applicable standard of care by failing to move toward expeditious delivery. This failure to react to the acidotic

11

fetus by initiating IURMs and delivering expeditiously resulted in an asphyxial event lasting twenty-four minutes, which caused Emily Dominguez's current condition–spastic quadriplegic cerebral palsy.

The Court recognizes that the Government presented evidence that the applicable standard of care is other than that described by Dr. Cardwell and that regardless of the standard of care applied, Darnall personnel were guilty of no breach. The Court, however, concludes otherwise.

The Government has failed to convince the Court of its alternative theory–that the fetus was already brain-damaged when Sandra Dominguez arrived in the Clinic and thus that the actions of the Clinic staff did not cause Emily's brain damage.

It is the opinion of this Court that the greater weight of the credible evidence supports the Plaintiffs. Accordingly, the Court finds that the Plaintiffs have proved their case by a preponderance of the evidence and now turns to the issue of damages.

B. *Damages*

1. *Past Medical-Care Expenses*

The Court finds that Emily Dominguez has been treated by various healthcare providers, has undergone surgeries and therapy, and will require additional surgeries and therapy in the future. She has been provided attendant care by her parents, primarily Sandra Dominguez. The Court has considered the charges incurred for past medical and therapy treatment and finds them reasonable and necessary for the treatment of a child with spastic quadriplegic cerebral palsy. The unreimbursed charges aggregated are $50,400, which the Court concludes, if now paid in cash, would fairly and reasonably compensate Sandra and Jose Dominguez for the reasonable costs of necessary medical and health care incurred in the past due to Emily Dominguez's medical condition.

The Court finds that $495,159, if paid now in cash, will fairly and reasonably compensate

Sandra Dominguez for her share of the attendant care provided to Emily Dominguez from the date of Emily's birth until the date of trial.

The Court finds that $85,527, if paid now in cash, will fairly and reasonably compensate Jose Dominguez for his share of the attendant care provided to Emily Dominguez from the date of Emily's birth until the date of trial.

*2. Future Medical-Care Expenses*

Plaintiffs and Defendant each employed the services of life-care planners to assist in determining the expenses associated with Emily Dominguez's future medical-care needs including therapy. The Court finds that the life-care plan created by Plaintiffs' experts, Dr. Willingham and Nurse Dan M. Bagwell (the "Willingham-Bagwell Plan" or the "Plan"), provides the appropriate amount and quality of care to meet Emily's future needs. The Plan provides for outpatient physician services, therapeutic services, medication, routine diagnostic services, nursing and attendant care, facility-based life care,[17] home and vehicular modifications, inpatient care, and equipment and supplies. In current dollars, the cost of this life-care plan is $16,981,209.[18] The Court finds that the components of the Willingham-Bagwell Plan are all necessary within a reasonable degree of medical probability and that the Plan's assessment of costs is also reasonable. Further, based on the extent of Emily Dominguez's disability, this Court concludes that the provisions of the Willingham-Bagwell Plan, which are far more extensive than those set forth in the plan proffered by the Government, are necessary to adequately provide for Emily Dominguez's future needs.

The Court further finds, based on a preponderance of the evidence, that Emily Dominguez

---

[17] Although the Dominguezes contemplate caring for Emily Dominguez in their home for as long as they are able, the life-care plan provides for Emily to move to a facility when she turns thirty-two–at which time her mother, Sandra Dominguez, will be sixty years old.

[18] For convenience, the Court has rounded Dr. Willingham's projected cost of the life-care plan from $16,981,208.62 to $16,981,209.

13

may reasonable expect to live to age 62, a shortened life expectancy from the normal Hispanic female. In so finding, the Court rejects the opinion of Ms. Donna Johnson and Dr. Lori Wassenburger, the Government's life-care-plan experts, that Emily Dominguez's life expectancy is thirteen years.

Both sides presented expert testimony suggesting how to calculate the net present value of Emily's future medical needs as described in the Willingham-Bagwell Plan. The experts' methods produce drastically differing results.

Plaintiffs' economic expert, Dr. Donald Huddle, finds the net present value of the Willingham-Bagwell Plan to be $22,602,150–an amount which is actually *more* than the current cost of the plan–while Government's economic expert, Dr. Stan Smith, calculates the overall value of the Plan to be $5,287,027. In making these calculations, both experts consider the rates of growth affecting the costs of the Plan's components, as well as the discount rate. Both Dr. Huddle and Dr. Smith testified that their proposed discount rates comport with the Fifth Circuit's opinion in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1984). *Culver* requires the Court to employ the "below-market discount rate method" to derive the specific future damages to be awarded. *Id.* at 122.

> In the below-market-discount method, the fact-finder does not attempt to predict the wage increases the particular plaintiff would have received as a result of price inflation. Instead, the trier of fact estimates the wage increases the plaintiff would have received each year as a result of all factors other than inflation. The resulting income stream is discounted by a below-market discount rate. The discount rate represents the estimated market interest rate, adjusted for the effect of any income tax, and then offset by the estimated rate of general future price inflation.

*Id.* at 118. Said another way, what the Court must determine is what amount of money, if paid at the time of trial, would compensate for the cost of the Willingham-Bagwell Plan and Emily Dominguez's lost earnings.

14

Here the experts' disagreement primarily centers on what market interest rate should be used to calculate the appropriate discount rate. Although they generally agree on the effect of taxes and inflation, they sharply disagree on the discount rate. Dr. Huddle uses a 1.2% adjusted discount rate based on the November 13, 2003 spot rate of return on one-to-thirty-year United States government bonds. Dr. Smith employs a 7.89% adjusted discount rate based on a twenty-year average return from a portfolio consisting of 65% stocks (invested in the S&P 500 Index) and 35% bonds (invested in long-term government bonds). Dr. Huddle's approach is the more conservative, relying solely on government bonds, while Dr. Smith's is the more aggressive, utilizing an approach applied by many of today's corporate money managers, to take advantage of the projected growth rate of stock-market equities. The Court is not convinced that either discount rate is entirely appropriate.

This Court is required to apply a rate "based on the return available from 'the best and safest investments.'" *Id.* (citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 527 (1983); *Culver v. Slater Boat Co.*, 688 F.2d 280, 302 (5th Cir. 1982) (en banc)). The Court finds Dr. Smith's proposed investment of Plaintiffs' damages in a mixture of 65% stocks and 35% bonds too aggressive given Emily Dominguez's needs, and that he unreasonably overestimates the rate of return that such a portfolio could reasonably expect in the market place–12.4%–resulting in too drastic a discount of the cost of the Willingham-Bagwell Plan, after accounting for taxes and inflation. Likewise, the Court rejects Dr. Huddle's analysis that medical costs will rise above the discount rate and declines to award an amount of damages in excess of the projected cost of the Willingham-Bagwell Plan, in part because the Court finds Dr. Huddle's "real discount rate" of 1.2%, derived by deducting an inflation rate of 2.3% from a 3.5% bond rate based on spot numbers, unreasonably underestimates the likely rate of return that may reasonably be expected.

Weighing all of the testimony, including the factors discussed above, the Court finds that the

15

appropriate discount rate to apply in this case is 5.3%, derived by utilizing the thirty-year rate of return on long-term government bonds of 9.4%, applying a tax-rate of 12% and an inflation rate of 3%, and rounding to the nearest .1%, resulting in a discount rate of 5.3%.

Taking all of the above into account, the Court finds that the evidence preponderates in favor of a finding that the present value of the services and care set forth in the Willingham-Bagwell Plan is $806,668. Approximately 25% of Emily Dominguez's remaining life expectancy will occur before the date of her majority, age eighteen. The Court estimates that approximately 25% of the total costs of the Willingham-Bagwell Plan will occur during that time period and determines that Sandra and Jose Dominguez will share that expense equally. Approximately 75% of Emily Dominguez's remaining life expectancy will occur after the date of her majority, and the Court estimates that approximately 75% of the total costs of the Willingham-Bagwell Plan will occur from her majority until her death.

Therefore, the Court finds the sum of $201,667, if paid now in cash, would fairly and reasonably compensate Sandra Dominguez and Jose Dominguez, from today until Emily Dominguez reaches eighteen years of age, for the reasonable costs of necessary medical and health care and therapy required by Emily Dominguez's medical condition.

The Court further finds the sum of $605,001, if paid now in cash, would fairly and reasonably compensate Emily Dominguez, from her majority until the date of her death, for the reasonable costs of necessary medical and health care and therapy required by her medical condition.

### 3. Loss of Earning Capacity

Due to her injury, Emily Dominguez's loss of earning capacity is complete. The Court finds that had Emily not sustained the injury that she did, she most likely would have obtained a bachelor's degree. The Court finds Defendant's economic expert Dr. Smith credible and his

methodology in calculating Emily's lost wages reasonable. However, the Court determines that the following changes to his calculations should be made: (1) the discount rate previously described should be used in discounting the lost wages to present value, and (2) the 85% personal-consumption deduction[19] which Dr. Smith applied beginning when the Willingham-Bagwell Plan places Emily in facility-based care should be reduced by 40%. The Court finds the sum of $80,668, if now paid in cash, would fairly and reasonably compensate Emily Dominquez for her complete loss of earning capacity.

### 4. Physical Pain, Mental Anguish, Physical and Mental Impairment, and Disfigurement

The Court finds that $2,000,000, paid now in cash, would fairly and reasonably compensate Emily Dominguez for her past and future physical pain and suffering.

The Court finds that $2,000,000, paid now in cash, would fairly and reasonably compensate Emily Dominguez for her past and future mental anguish.

The Court finds that $2,000,000, paid now in cash, would fairly and reasonably compensate Emily Dominguez for her past and future physical impairment.

The Court finds that $2,000,000, paid now in cash, would fairly and reasonably compensate Emily Dominguez for her past and future mental impairment.

The Court finds that $2,000,000, paid now in cash, would fairly and reasonably compensate Emily Dominguez for her past and future physical disfigurement.

### 5. Summary of Damages

The Court finds that the damages to be awarded should be apportioned as follows:

---

[19] The amount Emily is recovering for future medical costs includes money to pay for facility-based care beginning when she is thirty-two. The cost of the facility includes room and board–expenses usually covered by a person's income. Thus, the Court finds that her lost wages should be reduced to take this fact into account.

<u>Sandra Dominguez</u>:

| | | | |
|---|---|---|---|
| 1. | Past Medical Expenses: | $ | 520,539 |
| 2. | Future Medical Expenses: | | 110,834 |

Total:                                      $ 631,373

<u>Jose Dominguez</u>:

| | | | |
|---|---|---|---|
| 1. | Past Medical Expenses: | $ | 107,527 |
| 2. | Future Medical Expenses: | | 100,833 |

Total:                                         208,360

<u>Emily Dominguez</u>:

| | | | |
|---|---|---|---|
| 1. | Future Medical Expenses: | $ | 605,001 |
| 2. | Loss of Earning Capacity: | | 80,668 |
| 3. | Physical Pain, Mental Anguish, Mental Impairment, and Disfigurement: | | 10,000,000 |

Total:                                       $10,685,669

The Court finds that all funds awarded to or for the benefit of Emily Dominguez, a minor, shall be placed in a trust as provided by the Texas Property Code. *See* TEX. PROP. CODE ANN. § 142.005 (West Supp. 2004-05).

## *V. Conclusion*

In accordance with the foregoing,

It is **ORDERED** that Defendant United States of America is liable to Plaintiffs and shall pay the following amounts:

(1) To Emily Dominguez, a minor, by and through her next friends, Sandra Dominquez and Jose Dominguez, the total amount of $10,685,669;

18

(2) To Sandra Dominguez the total amount of $631,373; and

(3) To Jose Dominguez the total amount of $208,360.

It is further **ORDERED** that the damages awarded to Emily Dominguez, a minor, by and through her next friends, Sandra and Jose Dominguez, shall be held in trust for the use and benefit of said minor, after payment of attorney's fees and litigation expenses.

It is further **ORDERED** that Plaintiffs shall recover from Defendant United States of America postjudgment interest, which shall accrue and be payable on all of the above amounts at the maximum rate allowed by federal law when and as provided by such law. *See* 31 U.S.C. §§ 1304, 1961; *Transco Leasing Corp. v. United States*, 992 F.2d 552, 555 (5th Cir. 1993).

It is further **ORDERED** that Plaintiffs shall recover from Defendant United States of America their taxable costs in prosecuting this action.

It is further **ORDERED** that Mr. Gary E. Zausmer, as the guardian *ad litem* appointed to protect the interests of the minor plaintiff, Emily Dominguez, within thirty days of the date of this order, shall file with the Court and serve on all parties a report indicating the reasonable value of the services he provided as guardian *ad litem*. Any award to Mr. Zausmer for his service as guardian *ad litem* will be taxed as costs.

It is further **ORDERED** that all findings of fact that are more appropriately considered conclusions of law are to be so deemed. Any conclusion of law more appropriately considered a finding of fact shall be so deemed.

It is finally **ORDERED** that all other relief requested is **DENIED**, and any pending motions are **DISMISSED**.

SIGNED this _____ of March, 2005.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE